## Case No. 18,244.

### BOUKER v. The DELAWARE.[1]

Circuit Court, S. D. New York. July 31, 1879.[2]

COLLISION — LIABILITY — CHANGE OF COURSE BY STEAMER.

[A steamer is liable for a collision with a scow caused by the steamer suddenly changing her course to avoid being run into by a sailing vessel, unless it is proved that the steamer was without fault in getting into a position which made the change of course necessary.]

[Appeal from the district court of the United States for the Southern district of New York.

[This was a libel by John A. Bouker against the steam ferry boat Delaware. From a judg-

[1] [Not previously reported.]
[2] [Reversing Case No. 18,243.]

ment dismissing the libel (Case No. 18,243), libelant appeals.]

### Facts Found by the Court.

(1) On the 4th of September, 1873, between 10 and 11 o'clock in the forenoon, the steam ferryboat Delaware was proceeding on one of her regular trips from Pavonia, N. J., across the Hudson river, to her slip at the foot of Chambers street, in the city of New York. (2) At the same time the scow or float "N—8," owned by the libelant, in tow of the steam tug Adriatic, was passing down the river, from the foot of Gansevoort street, New York, towards the Battery, with a heavy deck load of artificial stone. Her course was about parallel with the heads of the piers on the New York side, and from four to six hundred feet distant. The scow or float was lashed to the starboard side of the Adriatic, and their speed with the tide was about four miles an hour. There was only one man on the scow, and there was no railing or guard on her deck aft of the bow. (3) The wind was a moderate breeze from the southward and westward and the tide ebb. (4) At the same time, also, a schooner and sloop were beating down the river, and running out their starboard tacks towards the New York shore. (5) While the Delaware was approaching her slip, the Adriatic, with the scow in tow, was passing down the river in such a way as to enable the Delaware, if she held her course, to get by astern in safety. The schooner went about on her port tack, and passed the Delaware port to port and astern. In this state of things, the Delaware discovered that the sloop was not coming around upon her port tack, and that, if she kept on her starboard tack, it would be impossible to pass her bows without a collision which might endanger the lives of passengers. The Delaware, thereupon, ported her wheel, and stopped and reversed her engines to keep out of the way of the sloop; but in so doing, before her headway could be stopped, her port guard ran against and shifted the cargo of the scow in such a way that, when the boats were separated, the scow upset and the cargo was lost overboard.

### Conclusion of Law.

(1) The Delaware was at fault in not slackening her speed or changing her course in time to keep out of the way of the sloop without coming into collision with the scow. (2) The libelants are entitled to recover.

Beebe, Wilcox & Hobbs, for appellant.
Shipman, Barlow, Larocque & McFarland, for appellee.

WAITE, Circuit Justice. The principal defense relied on by the claimant is that a sloop beating down the river, and running out her starboard tack toward New York, while attempting to come about on her port tack, missed stays, "and suddenly and unex-

pectedly her bow fell off to leeward and filled away toward the New York shore, causing her to head down the river and directly in the course of the Delaware." It is then alleged that on this course the sloop would have run into the Delaware, and endangered the lives of the passengers on board. For this reason, and to avoid such a collision, the Delaware, without any fault of her own, was compelled to change her course, and in so doing ran against the scow and her loading. This defense has not, I think, been made out by the testimony. When a steamer, bound to keep out of the way of another, attempts to excuse herself for a collision on the ground of an unexpected peril into which she was brought by the fault of some other vessel, she must free herself from all blame for getting into her place of danger. The burden of proof is on her, and, unless she shows that she was in no way responsible for the original fault, her excuse must fail. The witness chiefly relied on by the claimant is the pilot of the Delaware. He says: "I first observed the scow when I was about one-half way across the river. Scow was above Chambers street slip, headed down, between two hundred and three hundred feet out in the stream. * * * We would have passed under her stern. When I first discovered scow there were two sailing vessels beating down. They were some way above, on starboard tack, standing toward New York. According to ordinary course, they would have gone about one or two piers above my slip, and I would have gone across bows of both of them, and they would have gone about and passed on my port side. The other, I think a sloop, missed stays, and filled away again on starboard tack, heading toward New York. When she missed stays, if Delaware had held course, the sloop would have gone into the ladies' cabin of Delaware. When I discovered that sloop had missed stays, stern of scow was about opposite lower side of ferry slip. When I saw sloop had missed stays, I hove my wheel to port, and tried to turn my boat away from sloop. * * * When I ported * * * scow was probably 150 or 200 feet away. * * * If sloop had not missed stays, she would have gone clear of Delaware." This is the entire testimony of this witness, so far as it bears upon the point now under consideration. The other pilot of the Delaware, who was standing on the north bridge of the Chambers street slip, waiting to relieve the pilot on board when he came in, saw the Delaware sheer off and collide, but did not notice either the schooner or the sloop. A clerk of the steamer Narragansett, sitting on the forward deck of his steamer, as she lay, with her bow out alongside of the pier next above the ferry slip, saw the occurrence, and says: "I observed sailing vessel to north of Delaware. When I first saw sailing vessel, she was heading towards Jersey City." Then, again, on cross-examination: "When I first saw sloop, she was heading towards New York, so was the Delaware. Then I heard signal, and after that, and after collision, I saw sloop heading towards Jersey City, may be, and down stream, and a little shaky." This closed the testimony for the claimant. The libelants then called the pilot of the steam tug Whipple, in the employ of the claimant. He was on his tug lying at the pier next above the ferry slip, and within twenty feet of the end of the pier. He saw the Delaware when she was some where about the middle of the river heading about for the pier next above her slip, and on her regular course with the wind and tide as they were. He says: "Saw a sloop and schooner; small sloop. I noticed schooner going about when I first saw ferryboat,—going in stays. She stood off to windward. She bore at that time about north by west from Delaware. I should think schooner went within one hundred feet of Delaware. She went under stern of ferryboat. I saw sloop at the same time. She was between me and schooner. I did not see her go about. I think her jib was shaking when schooner went about. At that time sloop was within sixty or seventy yards of the Delaware, on port hand of Delaware, bearing northeast from Delaware. Sloop and Delaware were at that time a little nearer the New York shore than half way of the river. After that I noticed nothing till noise of collision. As I looked they were 150 to 200 yards out in the river. The Delaware was heading about southeast by south. * * * The sloop was half way from them to New York, and four hundred feet from sloop to Delaware." The libelant himself testified that he saw the sloop somewhat above the Delaware on the New York shore, heading for upper side of the ferry slip, or perhaps above. The schooner was then off in the river heading towards the ferry shore, astern of the Delaware, and the sloop was three hundred yards from the Delaware.

Such is the testimony and all of it relating to the sloop. I am satisfied, from the evidence, that the collision must have occurred not much less than six hundred feet out in the river from the ends of the piers. The Delaware had not then got straightened down the river after changing her course, and, as she hit the scow on the starboard side with her port guard, it is evident that when she changed her course she was even further out. She was going ahead all the time, and was not finally stopped until the collision. Taking everything into consideration, I am entirely satisfied that the collision was caused, not by the sloop's "missing stays," but by her not attempting to go in stays and put herself on her port tack as soon as the pilot of the Delaware expected she would. Seeing the schooner go about and pass under his stern, he seems to have taken it for granted that the sloop would do the same thing, and kept on until it was too late to correct his

mistake without running on to the scow. The pilot stands alone in saying that the sloop "missed stays," and even his testimony leaves a decided impression that what he calls "missing stays" was, after all, nothing more than "not going in stays." At any rate, he carefully avoids all details of her movements, which, as his case depended entirely upon his establishing this one important fact, is, to say the least, suspicious. I find nothing to show that the sloop ought to have gone about sooner than she did. It is true the pilot says that according to course they (the schooner and the sloop) would have gone about one or two piers above his slip, but there is nothing to show that the sloop had reached that point when he found it necessary to change his course, or that she had got so near the New York shore as to make it proper for her to go about. She had the right, as against the Delaware, to keep her course until prudence required her to take the other tack. If the Delaware misjudged as to her movements, that furnishes no justification for the collision which followed or the consequence. I cannot but think that is the position which the Delaware occupies.

The libelants are entitled to a decree fixing the liability of the Delaware, and directing a reference to ascertain the amount of damages. An entry may be prepared to this effect.

———

BROADRUP (BLAGDEN v.). See Case No. 18,238.

BROOKE (DARRELL v.). See Case No. 18,287.

BUNTING (BLOOMER v.). See Case No. 18,242.

# C.